**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TROPIC TECHNOLOGIES, INC., | |
| *Plaintiff,* | Docket No.: _____ |
| v. | **COMPLAINT** |
| VENDR, INC. and STEPHEN ANDERSON, | |
| *Defendants.* | |

Plaintiff Tropic Technologies, Inc. ("Tropic" or "Plaintiff"), submits this complaint against Vendr, Inc. ("Vendr"), and Stephen Anderson ("Anderson" and, together with Vendr, "Defendants"), and respectfully alleges as follows:

**NATURE OF ACTION**

1.      This action is necessary to remedy the harms, damages, and theft caused by Stephen Anderson, one of Tropic's senior-level employees, who has accepted an employment offer from Tropic's direct competitor Vendr, while concurrently stealing a trove of Tropic's confidential documents prior to his departure.  Anderson's actions, and Vendr's complacency in continuing with Anderson's offer of employment, give rise to claims for breach of contract, tortious interference, unfair competition, misappropriation, unjust enrichment, breach of fiduciary duty, violations of the federal Computer Fraud and Abuse Act, and violations of the federal Defend Trade Secrets Act.

2.      Tropic and Vendr are direct competitors in the niche platforms for offering Software-as-a-Service, or SaaS, industry, and offer similar products to a virtually identical customer base.  The SaaS and SaaS services market is unique, highly competitive, and specialized.

Strategies, technology, and relationships are perhaps the biggest competitive advantage in the industry.

3.      In July 2022, Anderson informed Tropic of his intention to join Vendr, its direct competitor. This decision was in clear and intentional violation of his employment agreement with Tropic (the "Employment Agreement"), which includes a provision prohibiting employment with a competitor for a one-year period.  As set forth below, Anderson owes a number of duties to Tropic that were made a condition of his employment and are embodied in contracts between him and Tropic.

4.      Perhaps more importantly, Anderson violated a Proprietary Information and Invention Assignment Agreement (the "Proprietary Agreement") and a range of laws prohibiting the theft of sensitive business information.  After Tropic was notified of Anderson's intentions, Tropic reviewed its internal databases and determined that Anderson *downloaded hundreds of Tropic proprietary files and documents* before leaving the company.  Most of the files were downloaded on a single day; Anderson had no business reason for downloading these documents, as they were accessible to him remotely; and many of the files were not created by Anderson but rather other Tropic employees and related to matters outside of his areas of responsibility.

5.      Remarkably, when Anderson's violations of the Employment Agreement and Proprietary Agreement were brought to his and Vendr's attention by counsel to Tropic, Anderson did not deny his violations and Vendr made clear its intention to proceed with Anderson's employment.

6.      To date, Anderson has not returned the confidential information he stole from Tropic's servers and Vendr has still not rescinded its offer of employment to Anderson.  In other words, Anderson and Vendr intend to use Tropic's confidential information and Anderson's wealth

of knowledge concerning Tropic's business to allow Vendr to gain an advantage in their competitive industry.

7.      The Court's intervention is therefore urgently needed to address Anderson's violations and theft and Vendr's related misconduct.

## THE PARTIES

8.      Plaintiff Tropic Technologies, Inc. is a Delaware corporation with its principal place of business in the state of New York.

9.      Defendant Vendr, Inc. is a Delaware corporation with its principal place of business in the state of Massachusetts.

10.     Upon information and belief, Defendant Stephen Anderson is currently a resident of the state of Colorado. While he resided in California when he first commenced employment with Tropic, he apparently moved to Colorado prior to the majority of the misconduct at issue.

## JURISDICTION AND VENUE

11.      The Court has jurisdiction over the pending matter pursuant to 28 U.S.C. §1332(a)(1) because it is between citizens of different states and concerns a matter in controversy which exceeds the value of $75,000.00, exclusive of interest and costs.

12.     The Court has personal jurisdiction over Vendr because it transacts business in the State of New York and engaged in tortious conduct in the jurisdictions.

13.     The Court has personal jurisdiction over Anderson because in the Proprietary Agreement he agreed to exclusive jurisdiction and venue in the federal and state courts of New York, New York.

14.     Venue is properly laid in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in New York.

15.     This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

## STATEMENT OF FACTS

**A.     Tropic's and Vendr's Competing Businesses.**

16.      Tropic was founded in 2019 by David Campbell and Justin Etkin.

17.     Tropic provides its customers with multiple SaaS products and SaaS services. Tropic's SaaS products and SaaS services, among other things, include (i) a negotiation service that helps negotiate contracts that Tropic's customers have with their suppliers; (ii) the management of software contracts on behalf of Tropic's customers, from contract inception to contract execution; and (iii) solutions to monitor Tropic's customer's SaaS application usage.

18.     Upon information and belief, Vendr was founded in 2019 by Aaron White and Ryan Neu.

19.     Vendr similarly provides its customers with multiple SaaS products and SaaS services.

20.     Tropic and Vendr are direct competitors.  Indeed, Vendr is Tropic's primary competitor in the SaaS and SaaS services space.  Both companies target the same user and client base, offer similar SaaS products and SaaS services, and are in a growth mode.

21.     Currently, Vendr is more prominent than Tropic in the SaaS and SaaS services industry.  Based on public information, Vendr's recent funding round raised $150 million from various investors and the company has a $1 billion valuation.  In comparison, Tropic's last funding round raised $40 million.  Based on public information, Vendr employs hundreds of employees. In comparison, Tropic employs 131 employees.

22.     The identity of Tropic's clients, technologies, and growth strategy is considered highly confidential and proprietary.  Any materials related thereto are limited in distribution and access within Tropic.

23.     Tropic takes reasonable measures to protect the secrecy of much of the information it considers proprietary, such as maintaining sophisticated IT security and infrastructure; utilizing unique user IDs and strong passwords; and requiring certain employees to sign confidentiality agreements, which notify those employees that the disclosure of confidential and proprietary information is strictly prohibited.

**B.**     **Anderson Joined Tropic to Become its Director of Strategic Sourcing.**

24.     Anderson was hired by Tropic and began employment on or around October 5, 2020.  During his time at Tropic, Anderson held the senior-level position of Director of Strategic Sourcing.  In connection with that role, Anderson was tasked with developing strategies for negotiating commercial terms with software providers.  Anderson was one of Tropic's first ten employees and was hired to help develop Tropic's software negotiation services offering.  In its early stages, Anderson was the sole employee dedicated to this commercially sensitive area.

25.     Anderson went on to develop Tropic's overall strategic approach and consultation tactics for software negotiations with Tropic's vendors.

26.     Anderson also codified strategies and learnings for all of Tropic's suppliers with the goal of disseminating these learnings to his Tropic team members.

27.     Tropic hired additional personnel to directly support Anderson in capacities he deemed necessary to develop Tropic's negotiations offering.  Anderson's team ultimately grew to a team of thirty-four employees, all of whom reported to him.

28.     Anderson was also highly compensated by Tropic.  Just before his departure, Anderson's annual base salary was $170,000, exclusive of any bonuses or commissions.  In 2021,

Tropic awarded Anderson a $32,500 bonus.  During Anderson's tenure, he also received options to purchase 71,000 shares of Tropic's common stock.

**C.**     **Anderson's Contractual Obligations to Tropic Under the Employment and Proprietary Agreements.**

29.     In connection with his employment, Anderson was provided with, and gained access to, a wide variety of confidential information belonging to Tropic, including: (1) Tropic's clients; (2) the length of their contracts with Tropic; (3) the terms of their contracts with Tropic; (4) specific client concerns and areas of interest; (5) Tropic's suppliers; (6) specific demands and areas of interests of Tropic's suppliers; (7) Tropic's content, business, and growth and development strategies; (8) Tropic's SaaS technology; (9) Tropic's product plans and related negotiation strategies; and (10) pricing structures through which Tropic generates revenue.

30.     In addition, Anderson was expected to analyze and understand Tropic's competitors, and help develop responses and proactive negotiation strategies to maintain and enhance Tropic's position in the SaaS and SaaS services market.  The relationships Tropic supported him in developing allowed Anderson to serve as the repository of critical client and supplier information for Tropic.

31.     As a condition of his employment with Tropic, Anderson entered into the Employment Agreement, which is governed by New York law.

32.     As a further condition of his employment, Anderson entered into the Proprietary Agreement, which detailed Anderson's obligations regarding the use and disclosure of Tropic's confidential information.  The Proprietary Agreement is governed by Delaware law.

33.     Both the Employment Agreement and Proprietary Agreement include several unambiguous obligations that bind Anderson following a departure from Tropic.

34.     The Employment Agreement, as set forth in the section "Reporting and Loyalty," provides, in relevant part, that for a one-year period after the termination of Anderson's Tropic employment, Anderson would not "directly or indirectly engage or participate in any business that is competitive in any manner with the business of the Company."

35.     The Employment Agreement was amended on October 21, 2021 (the "Amended Employment Agreement").  The Amended Employment Agreement provided for an increase in Anderson's salary and as well stock options.  No changes were made to any other provision of the Employment Agreement, including the "Reporting and Loyalty" section discussed above.

36.     Section 4(a) of the Proprietary Agreement required Anderson to agree, among other things, to "hold in strictest confidence, and not use, except for the benefit of the Company . . . without written authorization of the Company's Board of Directors . . . any Confidential Information of the Company."

37.     Section 4(a) of the Proprietary Agreement defines "Confidential Information" to include:

> any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom [Anderson] has called or with whom he or she became acquainted during the period when [Anderson] was providing any services to the Company in any capacity), markets, software, developments, inventions, conceptions, patentable subject matter, processes, formulas, technology, specifications, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information[.]

38.     Section 7 also required Anderson to:

> ***deliver to the Company (and [] not keep in [his] possession, recreate or deliver to anyone else)*** any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by [Anderson] pursuant to [his] provision of any services to the Company in any capacity or otherwise belonging to the Company, its successors or assigns . . . .

(emphasis added).

39.     In Section 10 of the Proprietary Agreement, Anderson agreed that for a one-year period, he would not "directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for [Anderson] or for any other person or entity."

40.     In Section 11 of the Proprietary Agreement, Anderson explicitly acknowledged that Tropic would be entitled to injunctive relief in the event he violated that agreement by misusing the company's confidential information.  Specifically, he agreed that:

> Because [Anderson]'s services are personal and unique and because [Anderson] may have access to and become acquainted with the Confidential Information of the Company, *the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief,* without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

(emphasis added).

## D.     Anderson's Breach of His Employment Agreement with Tropic.

41.     In 2020, Anderson informed Tropic that he intended to relocate from California to Colorado.  Anderson had been working remotely in Colorado while at Tropic and at one time Anderson's on-file address was a Colorado address.  Tropic attempted to support Anderson in his move.  On or around March 7, 2022, Tropic provided a letter to Anderson notifying him that Tropic had no intention of decreasing his salary in relation to his decision to relocate to Colorado.

42.     Tropic also tried to support Anderson's professional growth within Tropic. Anderson had been offered a promotion if he had satisfied certain performance goals by June 2022. While he did not reach those goals and Tropic informed him that the promotion would not happen this year, Tropic did not foreclose a promotion in the future.

43.     On July 6, 2022, Anderson informed Justin Etkin and David Campbell, Tropic's Chief Executive Officer, on a Zoom call that he was leaving Tropic.  Eventually, Tropic learned he was, in fact, leaving to join Vendr.  When Mr. Etkin confronted Anderson about his decision to join Tropic's direct competitor, Anderson told Mr. Etkin he wanted to stay in the same area he was currently working in and that there were only limited companies in the industry.  In other words, Anderson was apparently only looking to move to Tropic's direct competitors.

44.     Upon information and belief, the employment offer Anderson received from Vendr provides that Anderson's duties and responsibilities at Vendr would substantially overlap, be coextensive with, or greater than, his strategic duties and responsibilities at Tropic, and includes responsibilities relating to Vendr's product strategy.

**E.      Tropic Discovers Anderson's Theft and Breach of the Proprietary Agreement.**

45.     Anderson's employment with Tropic was scheduled to officially terminate in July 2022.

46.     After Anderson informed Tropic of his intention to move to Vendr, Tropic took steps to ensure no misconduct related to its confidential information would occur prior to Anderson's departure.

47.     Between the dates of June 21, 2022 and July 6, 2022, however, Tropic discovered that Anderson had downloaded hundreds of files and documents from its internal databases and servers.

48.     Based on Tropic's records, most of the files and documents were downloaded on a single day, June 21, 2022.  In total, Anderson stole at least 246 files and documents.  He may also have taken hardcopy documents, which would not show up on Tropic's internal logs, or documents

that he did not download.  For example, he could have taken photographs of documents or information to conceal his conduct.

49.     Anderson never requested permission to download these files, and these files constitute "confidential information" under the Proprietary Agreement.

50.     Anderson had no business reason for downloading the files and documents as they were accessible to him remotely through Tropic's online clouds and platforms.  The only reason to download the documents, as opposed to view them, would be to steal the materials.

51.     Many of the files and documents were not created by Anderson and related to matters outside of his areas of responsibility at Tropic.  Indeed, Tropic determined at least nineteen other Tropic employees authored these files.  Accordingly, this is not a situation where Anderson wanted to preserve presentations or other memoranda that he authored to use as templates.  He targeted documents that would only be useful in competing against Tropic or soliciting Tropic's clients and vendors.

52.     Moreover, several of the files and documents contained critical trade secrets.

53.     For example, some of these files and documents had titles specific to Tropic's clients and suppliers, such as Tropic - SaaS Vendor Pricing & Sales Strategies"; "Client Strategies"; "Client Email Strategy"; "Coaching Customers"; and "New Vendor Deal Checklist." Others relate to requests for proposal, commonly referred to as RFPs, that potential customers have made to SaaS platforms, like Tropic and Vendr.  Tropic submissions in response to RFPs would reveal critical and commercially sensitive information about Tropic's attempts to land large customers.  It appears Anderson downloaded these files with the intention of directly soliciting Tropic's clients and suppliers for Vendr's benefit.  Anderson also intends to use his knowledge of

Tropic's clients and suppliers to disparage Tropic's products in relation to Vendr's comparable product offerings.

54.     Certain files and documents that he downloaded relate to titles specific to Tropic's proprietary SaaS software products, services, and technologies, such as "Tropic Next Beta."  This is a new product that Tropic is launching and all aspects of it are highly guarded trade secrets.  If Anderson were to employ his knowledge of this while at Vendr, it could effectively shut Tropic out of product markets or create substantially similar products and services for Vendr's own benefit.

55.     Some files and documents also had titles specific to Tropic's growth plans, growth strategies, and internal deliberations such as "Template - Growth and Development Plan"; "CE Development Goals"; "February All-Hands – 2/9"; and "All Hands April 14, 2022."  The term "All Hands" refers to Tropic's internal meetings where low-level and high-level Tropic employees alike candidly discuss company business.  Should Vendr ever become privy to such documents or the information contained therein, they could use such information to undercut client relationships and attack Tropic's market share.

56.     Finally, Anderson took documents that would only be useful for soliciting Tropic employees, including "Employee Address Confirmation", "Tropic Remote hiring", "CE Team Forecast, Performance, and Hiring Metrics", and "CE Salary History." These types of documents would enable him (or Vendr) to contact Tropic employees directly armed with salary and information on internal policies and procedures.

57.     Because Vendr is a direct competitor and is eager to expand its business relative to Tropic, Anderson plainly stole Tropic's files and documents with the intent of using them to solicit Tropic's clients, suppliers, and employees ultimately for the benefit of Vendr.  But the sheer

volume of the materials also suggests that he simply wants to harm Tropic, who he may blame for not promoting him.

58.     Due to the aforementioned conduct by Anderson, Tropic formally terminated Anderson for cause on July 7, 2022.

**F.      Defendants Disregard Anderson's Breaches of the Employment and <u>Proprietary Agreements</u>.**

59.     Due to the events discussed above, Tropic asked outside legal counsel to write to Anderson and Vendr about the situation and to share Tropic's concerns.  Tropic expected that if Vendr was fully informed about the situation it would decline to hire Anderson.

60.     On July 8, 2022, counsel for Tropic separately wrote to Anderson and Vendr.  Each letter included copies of the Employment and Proprietary Agreements.

61.     The letter to Anderson (i) informed him that he was in violation of the Employment and Proprietary Agreements; (ii) demanded that he immediately return all documents, records and/or information relating in any way to Tropic's clients, employees, and/or business operations; and (iii) asked him to agree not to commence employment with Vendr, which was a direct competitor.

62.     Similarly, the letter to Vendr asked Vendr to immediately withdraw any offer of employment to Anderson.

63.     On July 11, 2022, Anderson emailed Sarah Jauhar, Tropic's Head of People, and asked Ms. Jauhar to "share instructions on how I should return any devices/materials back to Tropic[.]"  Although Anderson's email did not mention the letter that Tropic's counsel sent to Anderson informing him he had violated the Employment and Proprietary Agreements, his intent in sending the email was clear.  Critically, Anderson did not deny that he had stolen Tropic's

confidential information.  This was effectively an admission that the facts set forth in the letters were accurate.

64.   Ms. Jauhar responded that same day and directed Anderson to work through Tropic's outside counsel.  He neither responded to this email nor contacted outside counsel.  To Tropic's knowledge, Anderson is still in possession of all of the documents he took from Tropic.

65.   Vendr's counsel responded to the letter by asking for more time to investigate the situation.  Tropic pressed them for a response since Anderson was set shortly to start.

66.   On July 13, 2022, Vendr's outside counsel set a response letter that confirmed Vendr was going to proceed with hiring Anderson.  This letter tacitly acknowledged that Anderson had stolen Tropic's confidential information, as the lawyer specifically noted that Vendr had not directed Anderson to take the documents and "Vendr was unaware that the information was in Anderson's possession until it received your letter."

67.   But the letter attempted to push Anderson's misconduct to the side.  The lawyer noted that Anderson had offered to return the stolen materials to Tropic, which appeared to be a reference to the email he sent Ms. Jauhar.  While the lawyer claimed that Anderson's return of the materials and a "forensic review . . . should allay any concerns Tropic may have," that claim makes no sense.  Even if Anderson returned the documents he downloaded and Tropic conducted a "forensic review" of the files, Tropic would have no way to know if Anderson had made copies.

68.   Upon information and belief, despite knowing of Anderson's contractual obligations, Vendr nor Anderson has altered their position.

69.   Anderson's acceptance of Vendr's employment offer has violated the Employment Agreement and Proprietary Agreement.  Should he be permitted to start employment at Vendr, a

direct competitor, his duties and responsibilities will result in the inevitable use or disclosure of the "crown jewels" of Tropic's trade secrets.

70.     If Anderson is permitted to start employment at Vendr in violation of the Employment Agreement, it will cause irreparable harm to Tropic.  Once lost, Tropic's confidential information and trade secrets cannot be restored.  The nature of the losses that would be caused over both the short and long term if Tropic's confidential information and trade secrets were disclosed to Vendr – or used to help Vendr in competing with Tropic and/or enhance its competing business – cannot be fully quantified or fully measured.

71.     Money damages are thus inadequate to compensate Tropic for the damage to its business if Anderson is permitted to begin employment at Vendr. The same is true if Anderson and Vendr can take advantage of Tropic's confidential information for the purpose of competing with Tropic, in violation of the unambiguous terms of the Proprietary Agreement.

## FIRST CAUSE OF ACTION
### Breach of Contract (as against Anderson)

72.     Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

73.     Anderson entered with Tropic the Employment Agreement, which imposes restrictions on Anderson's acceptance of employment with a direct competitor of Tropic.  By accepting and commencing employment with Vendr (a direct competitor within the meaning of the Employment Agreement), before the end of the Employment Agreement's one-year restriction period, and in a job which, on information and belief, would require the violation of Anderson's ongoing contractual obligations to protect and not use or disclose confidential information about Tropic's business, Anderson is in breach of the Employment Agreement.

74.     By accepting and beginning employment with Vendr before the expiration of the non-compete period, Anderson will provide services to a direct competitor and/or engage in activities that would compete with the activities of Tropic, in breach of the Employment Agreement.

75.     By virtue of his conduct, Anderson has breached his obligations under the Employment Agreement and should be required to forfeit all compensation that he received thereunder.

76.     Further, Anderson entered with Tropic the Proprietary Agreement, which imposes restrictions on Anderson's use and disclosure of confidential information and trade secrets.

77.     By downloading hundreds of proprietary documents (confidential information within the meaning of the Proprietary Agreement) from Tropic's servers prior to his departure, Anderson is in breach of the Proprietary Agreement.

78.     Because the employment offer Anderson received from Vendr provides that Anderson's duties and responsibilities at Vendr would substantially overlap, be coextensive with, or greater than, his duties and responsibilities at Tropic, it is also inevitable Anderson will use and/or disclosure confidential information and trade secrets to Vendr.

79.     Unless Anderson is enjoined from being employed by Vendr, Tropic will suffer irreparable and incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated.  No adequate remedy at law exists for such a breach.

## SECOND CAUSE OF ACTION
### Tortious Interference (as against Vendr)

80.     Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

81.     Tropic has in place agreements with Anderson, specifically the Employment Agreement, which creates restrictions on Anderson's acceptance of employment with a competitor of Tropic.

82.     As a sophisticated employer, Vendr is aware of the existence of these types of provision.  On information and belief, it inquires with potential employees about whether they are bound by non-compete provisions before advancing an offer of employment.  Accordingly, Vendr was aware of the Employment Agreement prior to Anderson a position.

83.     Vendr has induced Anderson to violate his contractual obligations to Tropic by encouraging him to commence employment with Vendr (a competitor within the meaning of the Employment Agreement) and by inducing him to undertake job duties that substantially overlap with the duties he performed at Tropic and that would require the violation of Anderson's contractual obligations to protect and not use or disclose confidential information about Tropic's business that Anderson acquired in the course of his employment with Tropic.

84.     By the aforesaid wrongful actions, Vendr has caused and will continue to cause Anderson to breach his contractual obligations to Tropic.

85.     As a result of such wrongful interference, and unless Vendr is enjoined from continuing any employment of Anderson, Tropic has suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated. No adequate remedy at law exists for such misconduct.

### THIRD CAUSE OF ACTION
Unfair Competition (as against Vendr)

86.     Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

87.     Vendr has engaged in unfair competition by, among other things, participating with Anderson in a scheme to acquire a "knowledge transfer" from Anderson that is derived from and unavoidably incorporates Tropic's confidential information and trade secrets without authorization from Tropic.

88.     Such non-authorization violates the unambiguous terms of the Employment and Proprietary Agreements.

89.     As a result of the aforesaid actions by Vendr, Tropic has suffered and will suffer economic and immediate and irreparable harm to its business.

90.     Unless Vendr is enjoined from employing Anderson and thereby achieving the aforementioned knowledge transfer, Tropic will suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which it can never be compensated.  No adequate remedy at law exists for such misconduct.

91.     Money damages alone are inadequate to fully compensate Tropic for the incalculable loss of its competitive advantage, good will, and trade secrets caused by Vendr's wrongful acts.

### FOURTH CAUSE OF ACTION
Misappropriation of Trade Secrets (as against Anderson)

92.      Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

93.     Tropic possessed a variety of trade secrets that are non-public and that it protected using a range of safeguards

94.     Anderson downloaded documents containing those trade secrets without Tropic's permission and in breach of his contractual and fiduciary duties to Tropic.

95.     As a result of the aforesaid actions by Anderson, Tropic will suffer economic damages as well as immediate and irreparable harm to its business and goodwill.

96.     Unless Anderson is enjoined from being employed by Vendr, Tropic will suffer irreparable and incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated.  No adequate remedy at law exists for such misconduct.

97.     Money damages alone are inadequate to compensate Tropic fully for the incalculable loss of its competitive advantage, good will, and trade secrets caused by Anderson's wrongful acts.

### FIFTH CAUSE OF ACTION
Breach of Fiduciary Duty (as against Anderson)

98.      Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

99.     By virtue of Anderson's contractual and employment relationship with Tropic, Tropic reposed trust and confidence in Anderson to provide services and to refrain from acting in any matter contrary to Tropic's interests.

100.    By reason of the forgoing, Anderson owed Tropic a fiduciary duty and duty of loyalty to act in good faith and in Tropic's best interests.  Anderson owed these duties to Tropic independent of any contractual obligations to the Company.

101.    Anderson breached his fiduciary duty and duty of loyalty to Tropic by engaging in the wrongful activity as described herein including, but not limited to, joining a direct competitor in violation of his Employment Agreement and stealing Tropic's proprietary information prior to his departure.

102.    Anderson's actions were and are willful and malicious and without legal justification or excuse.

103.     Anderson's breach of his fiduciary duty and duty of loyalty has and will continue to directly and proximately cause substantial damage to Tropic and its business, including damage to its reputation.

104.     Anderson's breach of his fiduciary duty and duty of loyalty has and will continue to directly and proximately cause Tropic to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Tropic.

### SIXTH CAUSE OF ACTION
Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (as against Anderson)

105.     Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

106.     Anderson knowingly and intentionally accessed Tropic's servers in ways that were without authorization or in excess of his authorization.

107.     As noted herein, Anderson acknowledged in Section 4(a) of the Proprietary Agreement that he would "hold in strictest confidence, and not use, except for the benefit of the Company . . . without written authorization of the Company's Board of Directors . . . any Confidential Information of the Company."

108.     Furthermore, as a senior-level employee with years of experience in the technology industry, Anderson is aware of the restrictions surrounding trade secrets and proprietary information, and the limits on authorized access to such information within companies.

109.     By downloading hundreds of proprietary files and documents from Tropic's servers prior to his departure, which he was not authorized to do, Anderson improperly and illegally accessed, reviewed and copied proprietary information created by other Tropic employees that he

had no right or authorization to download.  He did this notwithstanding his awareness of Tropic's proprietary policies regarding confidential information.

110.    Anderson's unauthorized access of Tropic's computers and servers was for the purpose of acquiring information, including trade secrets, from those computers, for his own personal gain and/or for the benefit of Vendr.

111.    In response to learning of the unauthorized access by Anderson of confidential information on Tropic's servers, Tropic was compelled to conduct an investigation using internal and external resources regarding this unauthorized access. This investigation utilized and continues to utilize significant resources, including the cost of investigation and the time and attention of senior employees.

112.    As a result of Anderson's unauthorized access and abuse of its computer network, including the subsequent investigation, Tropic was damaged by Anderson's actions in an amount to be proven at trial that is well in excess of $5,000.

**SEVENTH CAUSE OF ACTION**
Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq. (as against Anderson)

113.     Tropic repeats and alleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

114.    Tropic operates its business in interstate commerce across the United States.  The trade secrets misappropriated by Anderson are related to, and intended for use in, interstate commerce.

115.    As set forth above, Anderson improperly acquired, accessed, viewed and downloaded Tropic's trade secrets and confidential information, thereby misappropriating Tropic's trade secrets pursuant to 18 U.S.C. § 1839(5)(A). The trade secrets misappropriated by Anderson include information regarding Tropic's business, operations, services, clients, growth

and marketing strategies, SaaS technologies and other proprietary information and/or commercially sensitive information that was secret, valuable in the industry, and had not been disclosed to anyone outside Tropic.

116.     Anderson improperly acquired, accessed, downloaded, and retained Tropic's trade secrets and proprietary information to compete with Tropic while employed at Vendr, a direct competitor.

117.     The aforementioned files and documents qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3). The misappropriated documents concerned Tropic's operations, services, clients, SaaS products, sales and marketing strategies, business information, plans, methods, and processes.

118.     Furthermore, Tropic has taken reasonable measures to keep such information secret by, among other things, requiring employees to execute proprietary agreements like the one Anderson executed.

119.     The trade secrets misappropriated by Anderson include highly confidential information which required substantial resources, time, and investment by Tropic to create and/or develop.  Tropic derives independent economic value from them not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as Tropic's competitors.

120.     Anderson's misappropriation of Tropic's trade secrets will cause Tropic to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

121.     Anderson's actions constitute willful and malicious misappropriation of Tropic's trade secrets pursuant to the DTSA.

## **REMEDY SOUGHT**

WHEREFORE, Tropic respectfully requests that judgment be made and entered against

Defendants as follows:

(1)   AS TO ALL CAUSES OF ACTION, an award granting Tropic monetary damages, the precise amount to be determined at trial including but not limited to the forfeiture of all compensation provided to Anderson under the Employment Agreement;

(2)   Preliminary and permanent injunctions, whereby Defendant Anderson would be enjoined from:

  a) Directly or indirectly accepting employment with Vendr through July 7, 2023;

  b) Using or disclosing any confidential information, data or trade secrets belonging to Tropic that were created, discovered, used or tested, or being developed, by Tropic during Anderson's employment, unless generally known in the trade or industry in which Tropic is engaged or ascertained from public or published information;

(3)   Preliminary and permanent injunctions, whereby Vendr, and all persons acting in concert with it, would be enjoined from:

  a) Directly or indirectly employing Anderson through July 7, 2023;

  b) Using or disclosing any confidential data or trade secrets belonging to Tropic that were created, discovered, used or tested, or being developed, by Tropic during Anderson' employment, unless generally known in the trade or industry in which Tropic is engaged or ascertained from public or published information;

(4)   Attorneys' fees;

(5)   Costs of suit, pre-judgment and post-judgment interest in the maximum amounts allowed by law;

(6)   Exemplary damages in a sum to be determined by the Court and finders of fact in an amount reasonable and necessary to punish the Defendants for their willful, malicious and wrongful conduct and to deter future misconduct; and

(7)   Judgment granting Plaintiff such other and further relief as the Court may deem just, equitable, and proper.

Dated: July 15, 2022                    By: */s/ L. Reid Skibell*
        New York, NY                         L. Reid Skibell
                                             Rich Ramirez
                                             **Glenn Agre Bergman & Fuentes LLP**
                                             1185 Avenue of the Americas
                                             22nd Floor
                                             New York, NY 10036
                                             Tel: (212) 358-5600
                                             rskibell@glennagre.com

                                             *Attorneys for Tropic Technologies, Inc.*