# Exhibit A



## GLENN AGRE BERGMAN & FUENTES

L. Reid Skibell
rskibell@glennagre.com

1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
212.358.5600

July 8, 2022

**By Email**

Ryan Neu
Chief Executive Officer
501 Boylston St
10th Floor
Boston, MA 02116

Re:   **Stephen Anderson**

Dear Mr. Neu:

Our firm is counsel to Tropic Technologies, Inc. ("Tropic" or the "Company"). To our understanding, Vendr, Inc. ("Vendr") has recently agreed to employ Stephen Anderson. We write to inform you that Mr. Anderson is in direct violation of his obligations to Tropic.

As I assume you are aware, Mr. Anderson recently resigned from Tropic, where he was employed in a director of strategic sourcing role from around October 2020 until July 2022. During his time at Tropic, he held a senior position and was entrusted with details of Tropic's confidential strategies, its technology, and its product plans. Consistent with his strategic role, Mr. Anderson signed (i) an employment agreement ("Employment Agreement") that included a loyalty provision and (ii) a proprietary information and invention assignment agreement ("Proprietary Agreement" and with the Employment Agreement, the "Agreements") that detailed Mr. Anderson's obligations regarding the use and disclosure of Tropic's confidential information.

While our client's investigation is still ongoing, Tropic has already discovered that shortly before Mr. Anderson's departure he downloaded ***hundreds of proprietary documents***, the majority of which have no bearing to his then-work for Tropic and many were not authored by him. In other words, Mr. Anderson decided to steal a trove of Tropic's confidential information to gild his exit. Given Mr. Anderson's brazen misconduct and the serious implications to the company in the likely event its confidential information is disclosed, he cannot be permitted to start at Vendr. We respectfully ask that you promptly withdraw Mr. Anderson's offer of employment.

By way of background, I have enclosed the Employee Agreement and Proprietary Agreement that Mr. Anderson entered with Tropic. As set forth in the section "Reporting and Loyalty" in the Employment Agreement, Mr. Anderson agreed, among other things, that for a one-year period after the termination of his Tropic employment he would not "directly or indirectly engage or participate ***in any business that is competitive in any manner*** with the business of the Company."

As set forth in Section 4(a) of the Proprietary Agreement, Mr. Anderson also agreed to:

Ryan Neu
July 8, 2022
Page 2 of 3

# GLENN AGRE BERGMAN & FUENTES 

hold in strictest confidence, ***and not use, except for the benefit of the Company*** . . . without written authorization of the Company's Board of Directors . . . any Confidential Information of the Company.

The Proprietary Agreement defines "Confidential Information" to include:

> any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom [Mr. Anderson] has called or with whom he or she became acquainted during the period when [Mr. Anderson] was providing any services to the Company in any capacity), markets, software, developments, inventions, conceptions, patentable subject matter, processes, formulas, technology, specifications, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information[.]

Mr. Anderson breached both Agreements. With respect to the Employment Agreement, Tropic and Vendr are both SaaS companies that offer clients superior services in the SaaS space, such as software purchasing, software savings products, and software products to increase procurement efforts. The companies target the same user and client base and are in a growth mode. Accordingly, Vendr's employment of Mr. Anderson has violated the unambiguous terms of his Employment Agreement.

Perhaps more importantly, Mr. Anderson violated the Proprietary Agreement and a range of laws prohibiting the theft of sensitive business information. Tropic has reviewed its internal databases and determined that Mr. Anderson downloaded hundreds of Tropic files and documents before leaving the company. There is no colorable excuse he can provide because the following facts conclusively demonstrate his intent: (1) most of the files were downloaded on a single day (June 21); (2) he had no business reason for downloading these documents, as they were accessible remotely; and (3) many of the files were not created by Mr. Anderson and related to matters outside of his areas of responsibility.

While we cannot share details of what Mr. Anderson pilfered, a representative sample of their titles demonstrates the commercially sensitive nature of the information:

- "Client Email Strategy";
- "Coaching Customers";
- "Template - Growth and Development Plan";
- "Payment Processing Infrastructure";
- "Software RFP";
- "New Vendor Deal Checklist";
- "Contract Review Pres.";
- "Development Goals";
- "Employee Address Confirmation";
- "February All-Hands – 2/9";
- "All Hands April 14, 2022";
- "CE Team Forecast, Performance, and Hiring Metrics";

Ryan Neu
July 8, 2022
Page 3 of 3

**GLENN AGRE BERGMAN & FUENTES** 

- "Cision/BW ZoomInfo"; and
- "Codecademy CompuData Sage Intacct Proposal 5-6-2021.pdf."

To the extent that Mr. Anderson would claim that he made a mistake and offers to return Tropic's document, Vendr still cannot proceed with employing him. Mr. Anderson's misconduct speaks loudly and demonstrates that he cannot be trusted with the confidential information to which he was exposed during his employment.

Indeed, Tropic would be legally entitled to keep him from starting at Vendr. The Proprietary Agreement is governed by Delaware law, which recognizes the "inevitable disclosure" doctrine. This doctrine permits a court "to limit [an employee] from working in a particular field if his doing so poses a substantial risk of the inevitable disclosure of trade secrets." *W.L. Gore & Asscs., Inc. v. Wu*, 2006 WL 2692584, at *14, *17 (Del. Ch. Sept. 15, 2006) (finding new employee "cannot 'unlearn' what he learned while working at [former employer] [such that] [i]f he is allowed to work with [the new employer], his extensive knowledge would almost certainly filter into his work and result in disclosure of [ ] trade secrets"). Where, as here, there is a substantial danger that an employee will reveal confidential information, this doctrine empowers courts "to enjoin even ***anticipated employment or other business activity*** that would result in inevitable disclosure in order to protect the former employer's confidential and proprietary information from disclosure." *Orthovita, Inc. v. Erbe*, 2008 WL 423446, at *10 (E.D. Pa. Feb. 14, 2008) (emphasis added).

\*     \*     \*

Under these circumstances, our client's legitimate business interests in its confidential information, business relationships, and employees will only be protected if Vendr withdraws any offer of employment to Mr. Anderson. We ask that Vendr promptly confirm that it has taken appropriate action with respect to this matter. We trust this request will be respected, as employee theft is an issue you also likely encounter. However, please also be forewarned: If Vendr proceeds to employ Mr. Anderson despite its knowledge of the facts discussed herein, Tropic will not hesitate to take legal action to protect its business interests. This could include claims against your company if Tropic learns it knowingly participated in Mr. Anderson's misconduct.

Sincerely,

*/s/ Reid Skibell*
L. Reid Skibell

DocuSign Envelope ID: 0AE57D28-5D40-4BEF-ABA9-D31F4C5B9ABC

September 16, 2020

Stephen Anderson
720 Gough St. Apt 28
San Francisco, CA 94102

Re:  Tropic Technologies, Inc. Offer of Employment

Dear Stephen,

On behalf of Tropic Technologies, Inc., a Delaware corporation (the "Company"), we are pleased
to offer you full-time employment in the position of Director of Strategic Sourcing, subject to the
following terms and conditions.

**Start Date and Location**

If you accept this offer, your employment start date will be October 5th, 2020. Your initial principle
place of employment shall be located remotely at a location of your choice.

**Base Salary**

As a full-time employee, you will initially earn an annual base salary of $140,000 payable on the
Company's normal payroll schedule and subject to tax and other withholdings as required by law.
Your base salary will be subject to review annually as part of the Company's normal salary review
process.

**Discretionary Quarterly Bonus**

Provided you satisfactorily meet the job performance requirements set by the Chief Executive
Officer of the Company (the "CEO") and based on the savings percentage realized by you for
contracts you manage as reasonably determined by the CEO (the "Bonus Requirements"), you will
be eligible for a quarterly bonus in an amount determined in accordance with the table set forth
below ("Quarterly Bonus"), subject to applicable withholdings, if any Quarterly Bonus is awarded.
You must be employed by the Company to be eligible to receive any Quarterly Bonus. For the
sake of clarity, if your employment ends, you will not be eligible for any Quarterly Bonus.
Quarterly Bonuses are not guaranteed.

| Savings % | Quarterly Bonus |
| --- | --- |
| <5% | $0 |
| 5-9.9% | $500 |
| 10-19.9% | $1,000 |
| 20-29.9% | $2,500 |
| 30-34.9% | $3,750 |

{00177200.DOCX;1 }

| 35%+ | $5,000 |
|------|--------|

## Equity Grant

It will be recommended to the Company's Board of Directors (the "Board") that you be granted an option to purchase 38,000 shares of the Company's Common Stock under the Company's 2019 Equity Incentive Plan (the "Option"). The shares subject to the Option will vest over time as you provide services to the Company. The vesting schedule shall be over a four-year period with 25% of the shares vesting on the first anniversary of your employment start with the Company and thereafter the remainder vesting at the rate of 1/48th of the total shares per month over the next thirty six months, subject to your continuous employment with the Company. The price per share of the shares will be the fair market value of the Common Stock per share on the date of grant by the Board. The Option will be evidenced by the Company's standard Option Grant Agreement, and will be subject to the terms and conditions of the Company's 2019 Equity Incentive Plan.

## Benefits

You shall be eligible to participate in all of the employee benefits and benefit plans that the Company generally makes available to its full-time regular employees, subject to the terms and conditions of such benefits and benefit plans. Detailed information about the benefits presently available will be provided to you after initiation of your employment.

## Expense Reimbursement

The Company will reimburse your reasonable business expenses in accordance with its standard reimbursement policies.

## "At Will" Employment

Employment with the Company is "at-will." This means that it is not for any specified period of time and can be terminated either by you or by the Company at any time, with or without advance notice, and for any or no particular reason or cause. It also means that your job duties, title, responsibilities, reporting level, compensation and benefits, as well as the Company's personnel policies and procedures, may be changed with or without notice at any time in the sole discretion of the Company. The "at-will" nature of your employment is one aspect of our employment relationship that will not change during your tenure as an employee, except by way of written agreement expressly altering the at-will employment relationship and signed by you and by the Company's CEO or COO.

## Reporting and Loyalty

You will initially report to the Company's CEO, David Campbell. Your report may be changed from time to time by the Company.

You agree to the best of your ability and experience that you will loyally and conscientiously perform all of the duties and obligations required of you. During your employment, you will

DocuSign Envelope ID: 0AE57D28-5D40-4BEF-ABA9-D31F4C5B9ABC

devote substantially all of your business time and attention to the business of the Company, the Company will be entitled to all of the benefits and profits arising from or incident to all such work services and advice, you will not render commercial or professional services of any nature to any person or organization, whether or not for compensation, without the prior written consent of the Company's CEO or COO, and during your employment with the Company, and for a period of one (1) year following termination of your employment, you will not directly or indirectly engage or participate in any business that is competitive in any manner with the business of the Company. Nothing in this letter will prevent you from accepting speaking or presentation engagements in exchange for honoraria or from serving on boards of charitable organizations, or from owning no more than 1% of the outstanding equity securities of a corporation whose stock is listed on a national stock exchange.

By signing and accepting this offer, you represent and warrant that: (i) you are not subject to any pre-existing contractual or other legal obligation with any person, company or business enterprise which may be an impediment to your employment with, or your providing services to, the Company as its employee or officer; and (ii) you have not and shall not bring onto Company premises, or use in the course of your employment with the Company, any confidential or proprietary information of another person, company or business enterprise to whom you previously provided services.

## Conditions

This offer, and any employment pursuant to this offer, is conditioned upon the following:

- Your ability to provide satisfactory documentary proof of your identity and right to work in the United States of America on or before your third day of employment.

- Your signed agreement to, and ongoing compliance with, the terms of the Company's *Proprietary Information and Invention Assignment Agreement.*

## Entire Agreement

If you accept this offer, and the conditions of this offer are satisfied, this letter and the written agreements referenced in this letter shall constitute the complete agreement between you and the Company with respect to the terms and conditions of your employment. This letter agreement shall supersede any existing employment arrangement or agreement with the Company. Any representations, whether written or oral, not contained in this letter or contrary to those contained in this letter that may have been made to you are expressly cancelled and superseded by this offer. Except as otherwise specified in this letter, the terms and conditions of your employment pursuant to this letter may not be changed, except by a writing authorized by the CEO or COO. New York law shall govern this agreement. If any provision of this letter agreement is held invalid or unenforceable, such provision shall be severed, and the remaining provisions shall continue to be valid and enforceable.

[Remainder of Page Intentionally Left Blank]

{00177200.DOCX;1 }

Sincerely,

TROPIC TECHNOLOGIES, INC.

By: *David Campbell*

Name: David Campbell

Title: Chief Executive Officer

**By signing below, I accept the above offer and confirm that I will begin employment on the date set forth below:**

Dated: _9/17/2020_

Signature

Start date: October 5, 2020

{00177200.DOCX;1 }

# TROPIC TECHNOLOGIES, INC.

## PROPRIETARY INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT

This PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT ("Agreement") is entered into as of September 24th, 2020 by and between Tropic Technologies, Inc., a Delaware corporation (the "Company"), and Stephen Anderson (the "Service Provider") and shall take effect and be binding on Service Provider as of the earliest date that Service Provider provided any services to the Company in any capacity, whether as an employee, consultant, independent contractor, or otherwise (such date, the "Effective Date"). For the avoidance of doubt, this Agreement is intended to cover the periods of time prior to, on and after the date hereof.

As a condition of Service Provider being offered the opportunity to continue to provide services to the Company and the receipt of the compensation now and hereafter paid to Service Provider, Service Provider hereby agrees to the following:

1. **No Right to Continue as a Service Provider**. No provision of this Agreement shall be construed as conferring upon Service Provider a right to continue to provide services to the Company in any capacity whether as an employee, consultant, independent contractor, or otherwise.

2. **Right to Advice of Counsel.** Service Provider acknowledges that he or she has had the right to consult with independent counsel and is fully aware of Service Provider's rights and obligations under this Agreement.

3. **Successors.**

(a) **Company's Successors.** Any successor to the Company (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company," shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this **Subsection (a)** or which becomes bound by the terms of this Agreement by operation of law.

(b) **Service Provider's Successors.** Without the written consent of the Company, Service Provider shall not assign or transfer this Agreement or any right or obligation under this Agreement to any other person or entity. Notwithstanding the foregoing, the terms of this Agreement and all rights of Service Provider hereunder shall inure to the benefit of, and be enforceable by, Service Provider's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

4. **Confidential Information.**

(a) **Company Information**. Service Provider shall at all times while Service Provider provides any services to the Company in any capacity and thereafter, hold in strictest confidence, and

not use, except for the benefit of the Company, or disclose to any person, firm or corporation without written authorization of the Company's Board of Directors (the "Board"), any Confidential Information of the Company.  As used herein, "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom Service Provider has called or with whom he or she became acquainted during the period when Service Provider was providing any services to the Company in any capacity), markets, software, developments, inventions, conceptions, patentable subject matter, processes, formulas, technology, specifications, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information of the Company. "Confidential Information" does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of Service Provider or of others who were under confidentiality obligations as to the item or items involved.

(b) **Former Employer Information**.  Service Provider shall not, during any period of time in which Service Provider is providing services to the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and Service Provider shall not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) **Third Party Information**.  Service Provider shall hold all confidential or proprietary information that the Company has received from any third party to which it is the Company's obligation to maintain the confidentiality of such information and to use it only for certain limited purposes in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out Service Provider's work for the Company consistent with the Company's agreement with such third party.

(d) **Exception to Confidentiality - Disclosure of Trade Secrets in Certain Circumstances.**  Pursuant to 18 U.S. Code § 1833(b), Service Provider is notified that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made in confidence to a federal, state, or local government official (directly or indirectly) or to an attorney *solely* for the purpose of reporting or investigating a suspected violation of law, or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if (and only if) such filing is made under seal.  In addition, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the individual's attorney and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

5.  **Inventions**.  Service Provider hereby represents, warrants and covenants as follows:

(a) **Inventions Retained and Licensed**.  Attached hereto, as Exhibit A, is a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by Service Provider prior to Service Provider's provision of any services to the Company in any capacity (collectively referred to as "Prior Inventions"), which belong to Service Provider, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if Exhibit A is left blank, Service Provider

hereby represents that there are no such Prior Inventions.  If in the course of Service Provider's provision of any services to the Company in any capacity, Service Provider incorporates into a Company product, process or machine a Prior Invention owned by Service Provider or in which Service Provider has an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, modify, make derivative works, distribute, use and sell such Prior Invention as part of or in connection with such product, process or machine.

(b) **Assignment of Inventions**.  Service Provider shall, or will promptly make, full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and agrees to assign and hereby assigns to the Company, or its designee, all of Service Provider's rights, title, and interest, including, without limitation, any right of priority, in and to any and all inventions, original works of authorship, developments, know-how, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which Service Provider may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice (i) in connection with any services provided by Service Provider to the Company; (ii) relating to the business or to the actual or demonstrably anticipated research and development of the Company; or (iii) using any resources, equipment, supplies or facilities or confidential information of the Company (collectively referred to as "Inventions"), except as provided in **Section 5(f)** below.  Service Provider hereby acknowledges that all original works of authorship which are made by Service Provider (solely or jointly with others) within the scope of and during the period of Service Provider's provision of any services to the Company that are protectable by copyright are "works made for hire" (to the greatest extent permitted by applicable law) are the sole and exclusive property of Company. Service Provider hereby understands and agrees that the decision whether or not to commercialize or market any Invention is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to Service Provider as a result of the Company's efforts to commercialize or market any such Invention.

(c) **Assignment or Waiver of Moral Rights**.  Any assignment of copyright hereunder (and any ownership of a copyright as a "work made for hire") includes all rights of paternity, integrity, disclosure or withdrawal or any other rights that may be known as or referred to as "moral rights" ("Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Service Provider covenants not to assert any Moral Rights against the Company and hereby waives such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

(d) **Maintenance of Records**.  Service Provider shall keep and maintain adequate and current written records of all Inventions made by him or her (solely or jointly with others) while Service Provider is performing any services to the Company in any capacity.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

(e) **Registrations**.  Service Provider shall assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's or its designee's rights in the Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the

Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to the Company or its designee, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  Service Provider agrees that it is Service Provider's obligation to execute or cause to be executed, when it is in Service Provider's power to do so, any such instrument or papers after the termination of this Agreement.  If the Company is unable because of Service Provider's mental or physical incapacity or for any other reason to secure Service Provider's signature to apply for or to pursue any application for any United States or foreign patents, mask works or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then Service Provider hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Service Provider's agent and attorney in fact, to act for and in Service Provider's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by Service Provider.

(f)  **Exception to Assignments**.  It is agreed and acknowledged that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as <u>Exhibit B</u>).  Service Provider covenants that he or she will advise the Company promptly in writing of any inventions that he or she believes meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on <u>Exhibit A</u>.  Service Provider represents that <u>Exhibit A</u> includes a complete list of Prior Inventions that Service Provider, under the California Labor Code Section 2870, desires to have specifically excluded from its obligation of assignment in **Section 5(b)**.

6.  **Conflicting Employment**.  Service Provider shall not, while performing services to the Company in any capacity, engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved while providing any services to the Company in any capacity, nor will he or she engage in any other activities that conflict with Service Provider's obligations to the Company.

7.  **Returning Company Documents**. At the time Service Provider ceases to provide services to the Company, Service Provider covenants that he or she shall deliver to the Company (and will not keep in Service Provider's possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by Service Provider pursuant to Service Provider's provision of any services to the Company in any capacity or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to **Section 5(d)**.  In the event of the termination of Service Provider's provision of services to the Company, Service Provider hereby covenants to sign and deliver the "<u>Termination Certification</u>" attached hereto as <u>Exhibit C</u>.

8.  **Notification of New Employer**.  In the event that Service Provider ceases to provide services to the Company in any capacity, Service Provider agrees to grant consent to notification by the Company to Service Provider's new employer about Service Provider's rights and obligations under this Agreement.

DocuSign Envelope ID: A422DED6-76AA-46F7-87A0-DAC49DAD49FF

9.  **Representations and Covenants**.  Service Provider agrees to execute any proper oath or verify any proper document required to carry out the terms of this Agreement.  Service Provider represents that his or her performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Service Provider in confidence or in trust prior to Service Provider's provision of any services to the Company in any capacity.  Service Provider has not entered into, and agrees not to enter into, any oral or written agreement in conflict herewith. Service Provider agrees that Service Provider bears the burden of proving that given information or materials are not Confidential Information or that the assignment of inventions does not apply under the circumstances.

10. **Solicitation of Employees**.  Service Provider covenants that, for a period of twelve (12) months immediately following the termination of Service Provider's relationship with the Company for any reason, whether with or without cause, he or she shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for Service Provider or for any other person or entity.

11. **Equitable Relief**.  Because Service Provider's services are personal and unique and because Service Provider may have access to and become acquainted with the Confidential Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

12. **Notice Clause.**

    (a) **Manner.** Any notice hereby required or permitted to be given shall be sufficiently given if in writing and delivered in person, by facsimile transmission, electronic mail, overnight delivery service or U.S. mail, in which event it may be mailed by first-class, certified or registered, postage prepaid, to either party at the address of such party or such other address as shall have been designated by written notice by such party to the other party.

    (b) **Effectiveness.** Any notice or other communication required or permitted to be given under this Agreement will be deemed given (i) on the day when delivered in person, (ii) on the first business day of or after the date of confirmation that the facsimile has been successfully transmitted to the facsimile number for the party notified if sent by facsimile, (iii) on the first business day of or after the date of receipt by the party notified if sent by electronic mail, or (iv) the third business day after the day on which such notice was mailed in accordance with this Section.

13. **Severability.**  The invalidity or unenforceability of any provision of this Agreement, or any terms hereof, shall not affect the validity or enforceability of any other provision or term of this Agreement.

14. **Integration.**  This Agreement represents the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral.  No waiver, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the parties hereto.

15. **Governing Law and Venue.**  This Agreement shall be governed by and construed in accordance with the internal substantive laws, but not the choice of law rules, of the state of Delaware. The state and federal courts located in New York, New York shall be the sole and exclusive forum for disputes arising out of or relating to this Agreement. The parties hereby consent to the personal jurisdiction of such courts.

16. **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which together shall constitute on and the same instrument.

17. **Representation**.   The parties hereto acknowledge and agree that M&H, LLP has represented only the Company in connection with the negotiation, drafting, and performance of this Agreement and the transactions contemplated hereunder.

*[Signature page follows]*

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by their duly authorized officers, as of the day and year first above written.

**TROPIC TECHNOLOGIES, INC.**                SERVICE PROVIDER:

                                             **STEPHEN ANDERSON**

By: *Justin Etkin*                           By: *Stephen Anderson*

Name: Justin Etkin                           Name: Stephen Anderson

Title: COO                                   Address: 720 Gough Street Apt 28

                                             San Francisco, CA 94102

                                             Email: sanderson3686@gmail.com

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

\_\_\_\_\_ Additional Sheets Attached

**-OR-**

\_\_\_X\_\_ No inventions or improvements

By: _Stephen Anderson_
Stephen Anderson

Date: _10/4/2020_

**EXHIBIT B**

**CALIFORNIA LABOR CODE SECTION 2870**
**INVENTION ON OWN TIME – EXEMPTION FROM AGREEMENT**

"(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of employee's rights in an invention to employee's employer shall not apply to an invention that the employee developed entirely on employee's own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

# EXHIBIT C

## TROPIC TECHNOLOGIES, INC.

## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Tropic Technologies, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I have complied with all the terms of the Proprietary Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

In compliance with the Proprietary Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its service providers, clients, consultants or licensees.

Date: _____

By: _____
                Stephen Anderson

{00164643.DOCX;1 }